OPINION
{¶ 1} This is an appeal of a judgment of the Portage County Court of Common Pleas upon a jury verdict, convicting appellant, Robin H. Stewart, of aggravated burglary and kidnapping.
 {¶ 2} This case stems from an incident which occurred at the home of the victims, Latasha Franklin ("Franklin") and Ronald Henderson ("Henderson"), in the early morning hours of October 29, 2000.
 {¶ 3} Trial commenced on January 23, 2001. Franklin testified that, on that morning, prior to leaving the house to go to work, she went to her garage to retrieve a cellular phone charger from her car. While outside, she was confronted by appellant and a male. Franklin testified that the male assailant pointed a gun at her, ordered her into the house, and instructed her to remain quiet.
 {¶ 4} Franklin testified that, once inside the house, she told the male intruder that the only person who knew the code to deactivate the alarm system in the house was her sister, who, she falsely claimed, was upstairs at the time. The two intruders took Franklin upstairs into the bedroom where Henderson was sleeping. Franklin testified that appellant restrained her hands behind her back with duct tape. The male intruder attempted to cock his handgun but it jammed, so he gave appellant the jammed gun, and took a gun from her. The male intruder went downstairs with Henderson to check the burglar alarm. After they went back upstairs, Henderson was also tied with duct tape. The male intruder took Franklin downstairs. While they were downstairs, Franklin heard gunshots.
 {¶ 5} Henderson testified that, on the morning in question, he had heard strange voices coming from downstairs so he took his handgun out of the nightstand and hid it under the bedcovers, before the intruders went upstairs. After appellant bound his hands with duct tape, the male intruder and Franklin went downstairs, leaving appellant to watch him. Henderson testified that he asked appellant to check on the children sleeping in the next room. While appellant was out of the room, Henderson untied his hands and recovered his handgun from the bed. When appellant returned, Henderson fired several shots at appellant, striking her once. Appellant and the male intruder ran from the house.
 {¶ 6} When the police arrived on the scene, they found appellant and the male hiding in a van owned by Jellaketa Jackson, Franklin and Henderson's babysitter. Appellant was taken to Robinson Memorial Hospital for treatment. Several hours later at the hospital, Lieutenant James Stein ("Lieutenant Stein") and Detective Sam Todd, officers of the Kent Police Department, spoke to appellant. Lieutenant Stein testified that he explained appellant's Miranda rights to her, secured a written waiver of her rights, and recorded her statement.
 {¶ 7} Appellant was charged with aggravated burglary, in violation of R.C. 2911.11(A)(2)(b), with a firearm specification and two counts of kidnapping, in violation of R.C. 2905.01, with firearm specifications. Appellant pleaded not guilty.
 {¶ 8} Prior to trial, appellant moved to suppress her statement, taken while she was at the hospital, on the ground that it was taken in violation of Miranda. The trial court overruled appellant's motion to suppress. The case came for trial on January 23, 2001. The state moved for a jury view of the victims' house and Jellaketa Jackson's house. The state's motion was granted, and a jury view was conducted under the supervision of the trial court's bailiff.
 {¶ 9} After the jury view, appellant moved the court for a mistrial, alleging that the bailiff improperly communicated with the jurors. The court overruled appellant's motion for a mistrial.
 {¶ 10} After the jury had deliberated the case for some time, they returned to the courtroom and informed the judge that they could not reach a verdict on the handgun specifications. The judge, misunderstanding what was said, believed that the jury was unable to reach a decision as to all of the counts against appellant. The judge then dismissed the jury and orally declared a mistrial.
 {¶ 11} A few minutes after the jury was dismissed, it was discovered that the jury had signed the ballots for the three charges, but had not decided on the firearm specification. The jury was called back into the courtroom, the verdict was read, and the jury was polled. Each of the jurors affirmed that the verdict, as shown by the ballots, was indeed his or her verdict. The judge declared a mistrial on the firearm specifications, and accepted the jury's verdicts of guilty on the aggravated burglary charge and one of the kidnapping charges. The jury found appellant not guilty on the remaining kidnapping charge. Appellant was sentenced to a term of seven years in prison for the aggravated burglary conviction and four years imprisonment for the kidnapping conviction, to be served concurrently.
 {¶ 12} From her conviction, appellant raises the following assignments of error:
 {¶ 13} "[1.] Appellant was denied due process of law, her right to a fair trial, and her rights under O.R.C. section 2945.33 when a verdict was accepted by the court after a mistrial had been declared and the jury had been discharged.
 {¶ 14} "[2.] Appellant was denied due process of law and her right to a fair trial due to inappropriate communications between the jury and outside individuals on at least three occasions before a verdict was rendered.
 {¶ 15} "[3.] The trial court erred in admitting appellant's statement to police officers given while medicated following surgery.
 {¶ 16} "[4.] The verdict of the jury was against the manifest weight of the evidence and there was insufficient evidence to sustain the jury's verdict."
 {¶ 17} In her first assignment of error, appellant argues that the trial judge erred by accepting the jury's verdict after he discovered that he had mistakenly declared a mistrial and dismissed the jury, thinking that they were hung on all the charges, rather than on the handgun specifications only. Appellant argues that R.C. 2945.33 requires the court to keep jurors together until their verdict is read to the court and the jurors are polled. Appellant also contends that, once the court declared a mistrial, it was illegal to accept the jury's verdict, regardless of the circumstances.
 {¶ 18} It is axiomatic that a court speaks only through its journal, and not through oral pronouncements. Schenley v. Kauth (1953),160 Ohio St. 109, paragraph one of the syllabus. The trial court's mistaken oral declaration of a mistrial did not actually result in a mistrial because a mistrial judgment was never journalized. Thus, the trial court was not prevented from realizing that it had misunderstood the communication from the jury, and correcting its erroneous decision to dismiss the jury and declare a mistrial. Appellant's assertion that the trial court erred as a matter of law by accepting the jury's verdict after declaring a mistrial is not well taken.
 {¶ 19} Furthermore, under the plain language of R.C. 2945.33, the trial court is required to keep the jurors together "until they agree upon a verdict, or are discharged by the court." In this case, the jury had agreed on the verdicts and signed the ballots finding appellant guilty of aggravated burglary and one count of kidnapping. This shows that the jurors had agreed on a verdict prior to being discharged.
 {¶ 20} Appellant argues that, because the jurors could change their minds on the verdict between the time they signed the ballots and the time they were polled, they can not be said to have agreed on the verdict until the court has polled them and accepted the verdict. We refuse to follow this restrictive view of what constitutes the jury's agreement on a verdict. The jury, at the time each of the jurors signed the verdict forms, had agreed upon its verdict. The fact that a juror could have changed his or her mind after signing the ballot is immaterial. The jury had agreed on its verdict, was subsequently polled, and each juror confirmed that the judgment represented by the ballots was, in fact, his or her verdict. Thus, we conclude that the court's acceptance of the jury's verdict did not violate R.C. 2945.33.
 {¶ 21} Appellant's first assignment of error is without merit.
 {¶ 22} In her second assignment of error, appellant argues that the trial court erred by overruling her motions for a mistrial on the grounds of improper communications with jurors. Appellant alleges three instances of improper communication with the jury. First, appellant alleges that the court's bailiff made improper statements to the jury during the course of the jury view of the victims' home. Second, appellant argues that one of the state's witnesses spoke to the alternate juror during a break in the trial. Third, appellant claims that improper communications with the jurors occurred between the time that the judge mistakenly dismissed the jury and the time the jury was reassembled in the courtroom.
 {¶ 23} In her first argument, appellant claims that the trial court's bailiff made improper comments to the jury during the course of the jury view of the victims' house. Appellant alleges that the bailiff said to the jurors, as they were led onto the porch of the house, "they came this way." Appellant also alleges that the bailiff pointed out bullet holes in the wall of the residence and said, "this is where the bullets went into the wall," and he may have said, "this is where they shot." Appellant does not claim that the bailiff used her name in any of these statements or that he specifically referred to her in any way.
 {¶ 24} Appellant claims that, through these statements, the bailiff was informing the jurors that there were multiple intruders, and argues that the court erred by failing to conduct a voir dire of the jurors and the bailiff to determine whether there was any prejudice to the jury.
 {¶ 25} Recently, this court confronted the issue of alleged improper communication with jurors. In State v. Henderson (Sept 29, 2000), 11th Dist. No. 99-T-0001, 2000 WL 1459858, this court stated:
 {¶ 26} "In State v. Phillips (1995), 74 Ohio St.3d 72, the Supreme Court of Ohio set forth the procedure and applicable law a court must follow when an allegation is made that an improper communication has occurred with one or more members of the jury. `When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror.' (Emphasis added.) Id. at 88, citing Smith v. Phillips (1982), 455 U.S. 209, 215-216
(`This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.') and Remmer v. United States (1954), 347 U.S. 227,229-230 (`The trial court should not decide and take final action ex parte *** but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.'). See, also, State v.Johnson (2000), 88 Ohio St.3d 95, 107."
 {¶ 27} The scope of a voir dire used to investigate allegations of improper communication with members of the jury is within the trial court's sound discretion. State v. Sanders (2001), 92 Ohio St.3d 245,252. Furthermore, courts have broad discretion in determining whether to grant a mistrial or replace a juror when instances of improper communication with jurors are alleged. Johnson, supra at 107.
 {¶ 28} R.C. 2945.16 authorizes the court to permit the jury to view a "place at which a material fact occurred." The statute provides that:
 {¶ 29} "the trial court may order them to be conducted in a body, under the charge of the sheriff or other officer, to such place, which shall be shown to them by a person designated by the court. While the jurors are absent on such view no person other than such officer and such person so appointed, shall speak to them on any subject connected with the trial." Id. (Emphasis added).
 {¶ 30} In this case, the bailiff was the person designated by the court to show the premises to the jurors. It was his job to point out things that counsel had requested. The fact that the bailiff may have said "they" when referring to the intruders does not show that he was telling the jury that there were, in fact, multiple intruders. The pronoun "they" is often incorrectly used as a non-gender-specific pronoun, referring to a single individual. In fact, if appellant is correct that the bailiff said, "this is where they shot," the bailiff used "they" to refer to Henderson, one of the victims of the crime, as well as to the intruders.
 {¶ 31} Furthermore, the jurors were instructed, both before and after the jury view, that the jury view was not evidence. After they returned from the jury view, the jury was also instructed that things they saw or heard while on the jury view were not evidence.
 {¶ 32} Because none of the alleged communications would be improper or prejudicial even if they did occur and because the court instructed the jury that anything they saw or heard during the jury view was not evidence, the court was not required to hold any sort of a hearing to determine whether the jury was biased by the communications. Appellant's first argument is not well taken.
 {¶ 33} This is not to say, however, that the bailiff's conduct while directing the jury view was proper. The bailiff should have refrained from commenting at all on what was being viewed by the jury. The bailiff should instead have simply directed the jury's attention to areas of importance in general terms, such as, "examine this wall," or "observe these stairs."
 {¶ 34} Next, appellant alleges that Officer Martin Gilliland, one of the state's witnesses, had a conversation with the alternate juror during a break in the trial. Appellant argues that the court erred by refusing to grant a mistrial and by refusing to voir dire the alternate juror.
 {¶ 35} The incident appellant refers to occurred during a break in Officer Gilliland's testimony. A public defender sitting in the gallery noticed that Officer Gilliland seemed to be speaking to the alternate juror from his seat at the witness stand. The public defender brought this information to the attention of the judge.
 {¶ 36} Officer Gilliland was brought back to the witness stand and questioned about this conversation. He testified that: he was speaking to the court's bailiff, who was standing between him and the alternate juror; he never spoke to the juror; and, he never left the witness stand.
 {¶ 37} Next, the bailiff was called to the stand and put under oath. The bailiff testified that he was seated between the juror and Officer Gilliland, that Officer Gilliland never left his seat in the witness stand, and that Officer Gilliland did not speak to any members of the jury.
 {¶ 38} The judge, who was in the courtroom at the time the conversation was alleged to have occurred, stated that he did not see Officer Gilliland speak to the jurors, but did see him talking to the bailiff. The state suggested that the judge conduct a voir dire of the juror, but he declined. Appellant's motion for a mistrial was denied.
 {¶ 39} The trial judge did not abuse his discretion by failing to conduct a voir dire examination of the alternate juror. The court did conduct a hearing at which both parties were permitted to participate, and Officer Gilliland and the bailiff were questioned. The bailiff's and Officer Gilliland's testimony about what had occurred was identical, and confirmed what the trial judge had also witnessed. Under these circumstances, the court did not abuse its discretion by declining to question the alternate juror before overruling appellant's motion for a mistrial. Thus, appellant's second argument is not well taken.
 {¶ 40} Appellant also claims that improper communications must have occurred between the time the trial judge mistakenly dismissed the jury and the time the jury was called back into the courtroom to read its verdict. Appellant argues that, since the court instructed the jurors that they were no longer restricted from talking about the case and the jury left the courtroom, they must have spoken to someone else about the case. Appellant argues that these presumed improper communications should be presumed to be prejudicial, and the court should have granted a mistrial.
 {¶ 41} Appellant is correct in his assertion that, in a criminal trial, any outside communication with a juror about a matter pending before the jury is presumptively prejudicial. State v. Phillips (1995),74 Ohio St.3d 72, 88-89. Once the defendant shows that improper outside communications have occurred, the government bears the burden to show that the contact was harmless to the defendant. Id. "In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial ***." Id. at 89.
 {¶ 42} Appellant, however, asks this court to engage in two presumptions. First, appellant asks us to presume that private communications occurred on matters before the jury. Then, once we have presumed the existence of such communications, we must presume that the communications were prejudicial.
 {¶ 43} Appellant, however, never made any showing that any improper communications occurred outside of a single unsupported, unsworn statement made in appellant's motion for mistrial, filed after the conclusion of the trial, that some of the jurors communicated to third parties about the case. More than mere speculation is required before the trial court must hold a hearing to determine whether outside communication biased the jurors; the defendant must show that there was a communication of a substantive nature. State v. Murphy (1992),65 Ohio St.3d 554, 575.
 {¶ 44} Furthermore, even if prejudice were presumed, the existence of any prejudice was rebutted. The trial transcript reveals that the time between when the jury left the courtroom and the time they were called back could only have been a few minutes. During this time, jurors would have retreived their coats and personal articles and begun descending the three stories to the ground level of the Portage County Courthouse. It is unlikely that any of the jurors were able to leave the building, particularly since the court was able to reconvene the jurors so quickly. There is likewise no evidence that any of the jurors talked to anyone else about the case. Any allegations that they did are mere speculation.
 {¶ 45} Most importantly, by the time the jury was mistakenly dismissed, the jurors had already agreed on a verdict and signed the verdict forms. When the jury was called back into the courtroom, only a few minutes after having been dismissed, each juror affirmed that the verdict reached on the ballot was indeed his or her verdict. While it may have been possible for a juror to change his or her mind, the fact remains that none of them did, nor did they participate in any further deliberations. This shows that any communications, which might have occurred after the jury was mistakenly dismissed, did not bias the jurors and prejudice appellant. Appellant's third argument is not well taken, and her second assignment of error is without merit.
 {¶ 46} In her third assignment of error, appellant argues that the trial court erred by failing to suppress the statement she made to police while in the hospital, on October 30, 2000. Appellant asserts two grounds for her assertion that the court erred. First, she argues that the trial court abused its discretion by finding that she knowingly and voluntarily waived her Miranda rights. Appellant also argues that the court erred as a matter of law by using the wrong legal standard to determine whether her waiver was voluntary.
 {¶ 47} "Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues. However, both are measured by the `totality of the circumstances' standard." State v. Eley (1996), 77 Ohio St.3d 174, 178; citing State v.Clark (1988), 38 Ohio St.3d 252, 261.
 {¶ 48} The court must find coercive police conduct before determining that a confession is involuntary. Eley, supra at 178; Statev. Hill (1992), 64 Ohio St.3d 313, 318; Colorado v. Connelly (1986),479 U.S. 157, 167.
 {¶ 49} This court has addressed the effect of intoxication on the voluntariness of a Miranda waiver. "The presence of [intoxicants] will not, by itself, make a statement per se inadmissible." State v. Stewart
(1991), 75 Ohio App.3d 141, 147, quoting State v. Daniel (Dec. 31, 1990), 11th Dist. No. 89-T-4214, 1990 WL 237188, at *26. This court also held that "'***while the presence of drugs or alcohol should be considered, the amount must sufficiently impair the confessor's abilities to reason.'" Stewart, supra at 147, quoting Daniel supra, at *26.
 {¶ 50} At the suppression hearing, appellant offered the testimony of Dr. Frank Kousaie, an anesthesiologist, who testified that he had reviewed appellant's medical records from October 30, 2001 to determine the types and amounts of drugs administered to her. Dr. Kousaie testified that appellant had received: 12.5 milligrams of Phenergan, an antipsychotic medication with a half-life of four to six hours, at 8:40 a.m.; 50 micrograms of Fentanyl, a powerful synthetic narcotic with a half-life of two hours, at 10:45 a.m.; and, 5 milligrams of morphine, which has a half life of four to six hours, at 2:15 p.m. Dr. Kousaie testified that these medications would have a sedative, mood altering effect on appellant, and that he would not have been able to get informed consent from her to perform an elective procedure. On cross-examination Dr. Kousaie testified that he had never met nor treated appellant, he was not present when the officers spoke to appellant, and that appellant had signed hospital consent forms dated October 30, 2000.
 {¶ 51} The state called Lieutenant Stein to testify. Lieutenant Stein testified that he went to the hospital to interview appellant at approximately 4:15 p.m. on October 30. Before going to the hospital, he called hospital security, who checked with appellant's doctor and informed Lieutenant Stein that he could speak with appellant. When Lieutenant Stein entered appellant's room, she appeared awake and alert, though she appeared to be in pain. Lieutenant Stein informed appellant that they were investigating the incident, read her the Miranda
warnings, and had her initial the Miranda form. Appellant signed a written waiver form, and proceeded to give her statement. Lieutenant Stein testified that during the time she was giving her statement, appellant appeared lucid and knew the details of what had occurred that morning.
 {¶ 52} The state also played for the court an audiotape of the interview Lieutenant Stein conducted with appellant on October 30. TheMiranda warnings were not clearly recorded, due to weak batteries in the tape recorder, but the interview itself was fully recorded after replacement of the batteries.
 {¶ 53} Appellant testified at the suppression hearing, solely on the issue of the voluntariness of her statement. She testified that she was drowsy and dozing off when the officers entered her room, and that she was tired, sleepy, and dozing off while she was being interviewed. On cross-examination, however, appellant admitted that she was detailed in her statement because she knew what had happened that morning.
 {¶ 54} Appellant claims that the trial court abused its discretion by ignoring the testimony of appellant and Dr. Kousaie when reaching its decision that appellant's waiver was voluntary. Appellant argues that the trial court did not mention whether it found the testimony of Dr. Kousaie and appellant credible or not, and that the court's decision was based solely on the testimony of Lieutenant Stein.
 {¶ 55} In its judgment entry on the motion to suppress, the court stated that:
 {¶ 56} "The Defendant maintains that she did not understand theMiranda Rights given to her, and did not voluntarily and knowingly waiver her rights under Miranda.
 {¶ 57} "The Defendant offered testimony of Dr. Kousaie, who testified from the medical records that the amount of drugs administered for pain would have put the Defendant in a mental state similar to intoxication, and that he would not have accepted a waiver for medical treatment under those conditions.
 {¶ 58} "The State offered the testimony of Officer Ray Stein, who administered the Miranda Warnings to the Defendant individually and had her initial the same, and took a statement from the Defendant.
 {¶ 59} "The Officer testified that the Defendant appeared to be lucid, in control of her faculties, and had a full understanding of what she was doing.
 {¶ 60} "The State further offered evidence of her condition by offering the taped statement, which the Court heard during the court proceedings."
 {¶ 61} It is clear from this discussion that the trial court did not ignore appellant's and Dr. Kousaie's testimony. The court considered all of the testimony given at the hearing and concluded that Lieutenant Stein's testimony was more credible.
 {¶ 62} "Weight of evidence and credibility of witnesses are primarily for the trier of fact — a principle applicable to suppression hearings as well as trials." State v. Treesh (2001),90 Ohio St.3d 460, 472, citing State v. Fanning (1982), 1 Ohio St.3d 19,20. We will not substitute our judgment for that of the trial court on this issue." Treesh at 472. By determining that appellant made a knowing and voluntary waiver, the court implicitly found that Lieutenant Stein's testimony about appellant's state at the time of the waiver was more credible than appellant's and Dr. Kousaie's testimony. It was not an abuse of discretion for the court to conclude that the testimony of Lieutenant Stein, who was present in the room with appellant, was more credible than that of Dr. Kousaie, who based his testimony solely on medical records. Nor was it an abuse of discretion to find that Lieutenant Stein's testimony that appellant was awake, alert, and lucid was more credible than her testimony that she was sleepy and dozing off during the interview, particularly when the court considered appellant's taped statement.
 {¶ 63} Appellant also claims that the trial court used the incorrect standard when reaching its decision. Appellant claims that the court should have, but did not, use the standard enunciated in Stewart, supra at 147. While it is true that the court never specifically mentionsStewart, or quotes the precise wording of the test, the court is not required to do so. The Stewart test is not a test which the court should consider in isolation, but is, instead, part of the "totality of the circumstances," which the court must consider when determining whether a confession is voluntary. The trial court found that:
 {¶ 64} "based upon the testimony of the officer and the statement that the Defendant appeared to know what she was doing, she was lucid, she gave accurate accounts of persons' names, telephone numbers, and other matters which she considered material in her statement, and the Court therefore finds that she could make a voluntary and knowing waiver of her Miranda Rights under those conditions."
 {¶ 65} This discussion, along with the court's discussion of each witness' testimony, shows that the trial court did consider the evidence and determined that the medications did not "sufficiently impair the confessor's abilities to reason." See Stewart, supra, at 147. Thus, the court did consider the test, enunciated in Stewart, as a part of its examination of the totality of the circumstances, and did not err as a matter of law.
 {¶ 66} Under the totality of the circumstances standard, the trial court did not err by refusing to suppress appellant's October 30 statement. Viewing appellant's statement in the totality of the circumstances, the suppression hearing transcript reveals no evidence that the officers questioning appellant used any coercive tactics.
 {¶ 67} The officers asked the attending physician, through hospital security, whether they could talk to appellant. The officers were told that they could talk to her, indicating that the attending physician must have believed appellant capable of talking to the police. After the officers went into appellant's room, she was read her Miranda
rights and she initialed next to each one. Appellant also signed a written waiver form, which is strong proof of the validity of the waiver. See State v. Clark (1988), 38 Ohio St.3d 252, 261.
 {¶ 68} Under the totality of the circumstances we find that appellant made a knowing and voluntary and intelligent waiver of herMiranda rights and gave a voluntary statement. The trial court did not err by refusing to suppress appellant's statement.
 {¶ 69} Furthermore, had appellant's statement been suppressed, the evidence of her guilt would still have been overwhelming. The state produced the eyewitness testimony of the two victims, who positively identified appellant as one of the intruders. Testimony was also adduced from the officers who were called to the scene, who found appellant and a male, who was identified as the male intruder, hiding in a van only minutes after the burglary. The officers testified that appellant had been shot in the leg, and that a handgun was found in the van near her. Thus, in light of the overwhelming evidence of appellant's guilt, the admission of appellant's statement, even if erroneous, is harmless. SeeState v. Brown (1992), 65 Ohio St.3d 483, 486.
 {¶ 70} Appellant's third assignment of error is without merit.
 {¶ 71} In her fourth assignment of error, appellant argues that her conviction was based upon insufficient evidence, and was against the manifest weight of the evidence. We shall deal with each of these issues separately.
 {¶ 72} This court has consistently held that an appellant must move for a Crim.R. 29 motion for acquittal at trial in order to preserve her right to appeal on the basis of the sufficiency of the evidence. See, e.g., State v. Barno (Sept. 21, 2001), 11th Dist. No. 2000-P-0100, 2001 WL 1116908 at *5. An appellant must also renew the motion at the close of evidence or any claimed error regarding the Crim.R. 29 motion is waived. State v. Barksdale (June 22, 2001), 11th Dist. No. 2000-L-088, 2001 Ohio App. LEXIS 2808 at *3.
 {¶ 73} A review of the record reveals that appellant never made a Crim.R. 29 motion for acquittal. Thus, appellant has failed to preserve her sufficiency argument for appeal. However, even if appellant had properly preserved the issue, the argument that her conviction was based upon insufficient evidence is without merit.
 {¶ 74} When reviewing the record of a criminal conviction for the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 75} To prove the crime of aggravated burglary, the state must show that appellant: (1.) by force, stealth, or deception, trespassed in an occupied structure; (2.) when another person other than an accomplice of the offender was present; (3.) with purpose to commit any criminal offense; and, (4.) appellant inflicted, or attempted or threatened to inflict physical harm on another; or (5.) appellant had a deadly weapon on or about her person or under her control. See R.C. 2911.11(A).
 {¶ 76} To prove kidnapping, the state must show that appellant by force, threat, or deception removed another from the place where the other person is found or restrained the liberty of the other person, for the purpose of facilitating the commission of any felony or flight thereafter. R.C. 2905.01(A)(2).
 {¶ 77} Franklin testified that appellant and a male forced their way into her house, took her upstairs into the bedroom where Henderson was sleeping and bound her hands with duct tape. She testified that both appellant and the male had guns and, after his gun jammed as he attempted to cock it, the male intruder exchanged guns with appellant. Henderson testified that appellant pointed a gun at him, and that the pair demanded money from him. Henderson also testified that appellant duct taped his legs and arms together and was attempting to take Franklin's purses. At trial both Franklin and Henderson identified appellant as one of the intruders.
 {¶ 78} Viewing this evidence in a light most favorable to the prosecution, there is substantial credible evidence to support the conviction of appellant beyond a reasonable doubt. Appellant's assertion that her conviction was not supported by sufficient evidence is not well taken.
 {¶ 79} Appellant also alleges that her conviction was against the manifest weight of the evidence. She bases this conclusion on the argument that the testimony of the victims, Franklin and Henderson, was conflicting and, therefore, was not credible.
 {¶ 80} When a court reviews a jury's verdict in a criminal case to determine whether it is against the manifest weight of the evidence, it:
 {¶ 81} "`weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983)20 Ohio App.3d 172, 175.
 {¶ 82} As discussed above, Freeman and Henderson provided testimony which was sufficient, when viewed in a light most favorable to the prosecution, to find that appellant committed all of the elements of the offenses beyond a reasonable doubt. Appellant claims, however, that Freeman's and Henderson's testimony was not credible because their testimony was "inherently unreliable." Appellant bases this claim on her allegation that Freeman's and Henderson's testimony was not consistent and credible with respect to how much money was stolen, how the victims got that money, which intruder duct taped which victim, what firearms were in the house, and where each person was during the course of the burglary.
 {¶ 83} Freeman testified that the intruders took "at least a couple thousands [sic]" of dollars from the top drawer of her dresser, and that the money was saved from her wages, Henderson's wages, gifts from her parents, and gifts from Henderson's grandparents. Henderson testified that the intruders took $2,500 to $3,000, and that the money was saved from his wages, Freeman's wages, and gifts from his grandparents. It is not inconsistent for one witness to testify that "a couple thousand" dollars were taken and another to testify $2,500 or $3,000 were taken. In addition, both witnesses testified that the money came from the same sources. Appellant attempted to impeach the witnesses with the fact that their jobs were not particularly well-paying, but this fact does not make the victims' testimony that they had accumulated this amount of money from wages and gifts incredible.
 {¶ 84} Appellant also points to an inconsistency between the testimony of Freeman and Henderson as to who bound Freeman with duct tape. Freeman testified that she couldn't remember clearly, but she believed that appellant had duct taped her, and had also duct taped Henderson. Henderson testified that appellant had duct taped him, but that the male intruder had duct taped Freeman. This inconsistency as to who bound Freeman does not rise to the magnitude required to make the verdict against the manifest weight of the evidence, particularly in light of the fact that appellant was found not guilty of kidnapping Freeman.
 {¶ 85} Appellant also attempted to impeach Henderson with regard to the location of one of his pistols. At trial, Henderson testified that, after he shot appellant, he retrieved a second .45 caliber pistol from a laundry basket in his bedroom. Appellant impeached him with his police statement, in which he said that he retrieved the pistol from the closet in his bedroom. While these two statements are inconsistent, they have no bearing on the central facts of the case. The second pistol was never fired, and, by the time Henderson had retrieved it, whether from the closet or the laundry basket, appellant was running from the house.
 {¶ 86} Appellant points to Henderson's testimony that one of the pistols used by the intruders was black and the other was chrome. At trial, both pistols recovered from the crime scene and placed in evidence were black. Certainly this is inconsistent with Henderson's testimony, but the inconsistency is not so great as to make the entirety of his testimony incredible. Certainly, Henderson could have been mistaken as to the color of one of the pistols.
 {¶ 87} Appellant also points to Freeman's testimony where she testified that when the male intruder told appellant to bind her, appellant did not appear to want to do it. Appellant claims that this "made it clear that [appellant] was not a willing participant." While this testimony could have formed the basis of a duress defense, it does not make Freeman's testimony any less credible, and it does not show that appellant's conviction was against the manifest weight of the evidence.
 {¶ 88} The fact that Freeman and Henderson did not agree on every detail of the burglary does not make their testimony inherently unreliable. The differences in the testimony merely reflect the differing perceptions of two victims of a frightening and confusing event. The victims' testimony was consistent on the essential elements of the crimes for which appellant was convicted: appellant and a male came into their home, demanded money at gunpoint, restrained them with duct tape and fled when Henderson shot appellant. Freeman and Henderson both positively identified appellant as one of the intruders. Furthermore, evidence was introduced that appellant was discovered hiding with a male in Jellaketa Jackson's minivan; at the time she was found, she had a gunshot wound and a gun was found in the van near her.
 {¶ 89} The evidence in this case weighs heavily in favor of conviction, rather than heavily against conviction. This is not one of the exceptional cases where the jury lost its way and created a manifest miscarriage of justice. Appellant's conviction was not against the manifest weight of the evidence. Appellant's fourth assignment of error is without merit.
 {¶ 90} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
DIANE V. GRENDELL, J., concurs.